STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. LOUIS THOMAS SCIRROTTO, A/K/A MARK SCIRROTTO, DEFENDANT–RESPONDENT.

Argued November 9, 1988—Decided May 1, 1989.

*Jessica S. Oppenheim,* Deputy Attorney General, argued the cause for appellant (*Cary Edwards,* Attorney General of New Jersey, attorney; *Edward R. Bonanno,* Deputy Attorney General, on the brief).

*Brian J. Neary* argued the cause for respondent.

The opinion of the Court was delivered by

STEIN, J.

In this case we focus on the interrelationship between two sections of chapter 27 of the Code of Criminal Justice (Code), which enumerates various offenses under the title "Bribery and Corrupt Influence." Specifically, we consider whether evidence offered by the State primarily to prove a violation of *N.J.S.A.* 2C:27–3a(2) ("Threats and Other Improper Influence in Official * * * Matters") is sufficient to sustain defendant's conviction

under *N.J.S.A.* 2C:27–2b and d ("Bribery in Official and Political Matters").

The State charged defendant, Louis Thomas Scirrotto, a teacher at the Warren Hills High School in Washington Township, with bribery in official matters in contravention of *N.J. S.A.* 2C:27–2b and d; threats and other improper influence in official matters, contrary to *N.J.S.A.* 2C:27–3a(2); and compounding, contrary to *N.J.S.A.* 2C:29–4.[1] Following presentation of the State's case, defendant moved for a judgment of acquittal, *R.* 3:18–1, on all three counts of the indictment. The trial court granted the motion with respect to the "threats" and "compounding" counts, but declined to dismiss the bribery count. After the jury returned a guilty verdict on the bribery count, the trial court sentenced defendant to three years' probation with a special condition of 120 hours of community service, and a twenty-five dollar violent crimes penalty. The Appellate Division, in an unpublished opinion, reversed defendant's bribery conviction on the ground that the evidence presented failed to establish a "benefit" within the meaning of the bribery statute. We granted certification, 110 *N.J.* 306 (1988), and now affirm.

## I.

The trial testimony fully supports the following account of the material facts. From 1981 to 1984 defendant taught history at the Warren Hills Senior High School in Washington Township, New Jersey. In April 1984, during his third year of

---

[1] *N.J.S.A.* 2C:29–4 describes the crime of compounding as follows:

A person commits a crime if he accepts or agrees to accept any pecuniary benefit in consideration of refraining from reporting to law enforcement authorities the commission or suspected commission of any offense or information relating to an offense or from seeking prosecution of an offense. A person commits a crime if he confers or agrees to confer any pecuniary benefit in consideration of the other person agreeing to refrain from any such reporting or seeking prosecution.

teaching, defendant was notified that he would not be rehired.[2] Defendant filed an appeal contesting his termination. While the appeal was pending, defendant spoke by telephone with John Mulhern, Superintendent of Schools, on June 7, 1984, and met with Warren Hills Principal Robert Fluck in Fluck's office the following day. The conversation between defendant and Fluck was recorded, as a consensual intercept, by a microphone concealed in Fluck's clothing, and the tape was presented as part of the State's evidence at trial. The telephone call with Mulhern and the meeting with Fluck constitute the subject matter of the bribery charge.

Mulhern testified that when defendant called him on June 7, 1984, he complained about the Board of Education's failure to renew his contract. According to Mulhern, defendant "told me that he knew of a serious problem in the school district and that the problem was more serious than what he called the 'Yrigoyen matter.'" (Yrigoyen was a former teacher at the high school who had pled guilty to charges of aggravated sexual contact with students in his home, and to charges of endangering the welfare of children.) Mulhern testified that defendant's reference to the Yrigoyen matter suggested to him "the situation where a teacher in the school system had been involved in criminal behavior which involved children on the premises of his home," and stated that the "Yrigoyen matter" resulted in unfavorable publicity for the Board of Education. Defendant stated that he had a number of supporters in the community, and that he had access to various media through which he might publicize his cause. Mulhern reported this conversation to the Warren County Prosecutor's Office, declining defendant's request to discuss the matter further.

---

[2] The Board of Education may decide, by majority vote, not to rehire nontenured teachers, that is, teachers who have worked for a period of one to three years. *See N.J.A.C.* 6:3–1.19 and 6.3–1.20.

Scirrotto and Fluck met the following afternoon in Fluck's office.[3]   At the request of the Warren County Prosecutor's Office, Fluck agreed to wear a concealed microphone and transmitter in his clothing.   While the exact referents are unclear, defendant made the following remarks during his taped conversation with Fluck: "I've got a lot of dirt"; "you've got such a tremendous shock coming to you"; "we've got it documented"; and "[w]e have enough stuff to rattle sabers." Fluck asked defendant several direct questions.   When defendant was asked specifically about his knowledge of illegal activities concerning the school, he replied, "I'm in a defensive posture at this point.   Six months ago I would have sat here and probably told you.   At this point I can't tell you but I can tell you this, we're not bluffing."

Fluck questioned defendant about "the one thing * * * that you told Mulhern that was worst [sic] than Yrigoyen."   Defendant replied, "you'll have to wait until after I've discussed it with my lawyer," and added, "When that information is given out to the lawyer, then I'm gonna leave it up to the lawyer as to whether he thinks that I should use this now or not to tell you about it."   When Fluck asked if "[i]t's a problem with a teacher," defendant responded, "Well, no, I'm not going to say that.   I say, it's a problem with the school * * *.   This is an accumulation of three years * * * of things that I've gathered and that parents have gathered over that three-year period that we're gonna put together in a package if we have to and use it."   When asked if the information involved "teachers and kids," defendant replied, "Everybody.   It involves teachers, it involves the management of this school.   It involves everyone * * * from the janitors across the board."

---

[3]During a telephone conversation prior to their meeting, defendant told Fluck, "Remember, I have the Tostos note."   Fluck testified that he did not understand defendant's reference to "the Tostos note."   At trial it was explained that the "Tostos note" was a note passed between two female students concerning Tostos, a teacher in the school, and suggested sexual improprieties.

Defendant acknowledged that there was a connection between the information he possessed and the Board's decision to terminate him:

DEFENDANT: * * * We have a tremendous statement to make. And again, the statement won't be read if I get tenure. If I'm rehired in this school in some capacity, the statement won't be made * * *. We'll retract it * * *. And, um, apologize if anybody had any indications or any accusations, uh, we, it's not true because it's easy to say that since we didn't make any specific statement.

     *     *     *     *     *     *     *     *

DEFENDANT: I'll tell you what I'll do, Bob, if I'm rehired * * *. I'll give it to you because I think it's worth giving and I think it's worth, I'll tell you what it's worth doing. It's worth watching. It's worth watching because if, if other things were worth watching and finally came to a head, this one is too. Not this one, these ones.

FLUCK: These, there's more than one?

DEFENDANT: I'd say so * * *. I won't give it to you until I'm given the tenure and I'll give it to you.

     *     *     *     *     *     *     *     *

FLUCK: You have proof?

DEFENDANT: Yes, I do. Teachers know I do too, several teachers know I have it because I showed it.

FLUCK: Why don't you show it to me?

DEFENDANT: I can't because I want my tenure and until I get my tenure I'm not gonna show it to you. I'll give it to the commissioner * * *. And if we have to say to the commissioner, well I'm getting thrown out of this school and this is what they do, then we'll use them. We'll use it. Again, we wanna open a can of worms. We want trouble here if we have to.

Defendant testified that his sole purpose in meeting with Fluck was "to discuss the newspaper article" that quoted Fluck regarding the denial of his tenure. He further testified that his analogy to the "Yrigoyen matter" related to "[t]he publicity that we generated from the mothers picketing, from the students petitioning the school" on his behalf. He stated that he intended to give all relevant information to his lawyer for the purpose of presenting it to the Commissioner of Education in connection with his administrative appeal. He acknowledged telling Fluck that he wanted his job and his tenure. Defendant denied possessing "any information that was illegal or immoral about sexual activities with kids."

In denying the motion to dismiss the bribery count, the trial court determined that there was "evidence from which a jury could infer that a benefit was offered in this case [and] that the jury can conclude or could infer that the benefit was offered in exchange for the teaching position or the tenure of the defendant herein." While the trial court noted that it was "hard to imagine" how there could be a direct benefit to Fluck or Mulhern on the State's proofs, it concluded that "the jury could * * * reasonably infer that Mr. Mulhern and/or Mr. Fluck had an interest in the welfare of the school district," apparently assuming that any withholding of publicity that benefitted the school district was also a benefit to Mulhern and Fluck. The court granted the motion to dismiss the "threats" count because it could not determine who was "the cause of the harm." [4] In the course of its ruling, the trial court observed that "it's almost inconsistent to argue that the defendant is in one sense threatening harm and in another sense offering a benefit."

The Appellate Division reversed defendant's conviction for bribery. It concluded that no "benefit" was offered to Mulhern, Fluck, or the school district in which they were interested, and therefore no bribery occurred. The court determined that the State failed to sustain its burden of proving that

---

[4]The propriety of the trial court's ruling on the "threats" count is not before us. *N.J.S.A.* 2C:27–3 ("Threats and Other Improper Influence in Official * * * Matters") provides, in relevant part:

A person commits an offense if he directly or indirectly:

(2) Threatens harm to any public servant with purpose to influence a decision, opinion, recommendation, vote or exercise of discretion in a judicial or administrative proceeding.

See *New Jersey Criminal Justice Quarterly*, Winter 1978, 156 ("Section 2C:27–3 is, in effect, a variation of the bribery prohibition. Its purpose is to prevent persons from subjecting public servants to undue influence by reason of threatened harm, as opposed to promised benefits. As with bribery, [it] is divided into several categories which depend upon the type of official action involved.").

either Fluck or Mulhern, or the school system in which they were interested, would have gained or received any advantage, or that which was regarded as an advantage, by virtue of defendant's offer to withhold publicizing the 'Yrigoyen' information but to disclose it to them.

The Appellate Division concluded that the "benefit" allegedly offered by defendant, "[t]he concealment of problems with the school system[,] would be disadvantageous to the students, teachers [and] the public and thus could not give rise to a legitimate inference that such conduct benefitted the system or those interested in its welfare."

## II.

*N.J.S.A.* 2C:27–2b provides in relevant part:

A person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

a. Any benefit as consideration for a decision, opinion, recommendation, vote or exercise of discretion of a public servant, party official or voter on any public issue or in any public election; or

b. Any benefit as consideration for a decision, vote, recommendation or exercise of official discretion in a judicial or administrative proceeding; or

c. Any benefit as consideration for a violation of an official duty of a public servant or party official; or

d. Any benefit as consideration for the performance of official duties.

"Benefit" is defined in *N.J.S.A.* 2C:27–1a as a "gain or advantage, or anything regarded by the beneficiary as gain or advantage, including a pecuniary benefit or a benefit to any other person or entity in whose welfare he is interested."

Our bribery statute is based in part on Model Penal Code (MPC) section 240.1 ("Bribery in Official and Political Matters"),[5] which defines "benefit" as follows:

---

[5]See Cannel, *New Jersey Criminal Code Annotated* (1989) at 464:

This section was derived from proposed 2C:27–2, based on MPC 240.1 with two additions. It was amended by L.1979, c. 178, to broaden its scope, first by the addition of the 'directly or indirectly' language of the first paragraph; second by removing the reference to 'pecuniary' benefit in subsection a.; by the addition of subsection d. and finally the paragraph immediately following that subsection was added to clarify that lawful salaries and fees were not included.

"benefit" means gain or advantage, or anything regarded by the beneficiary as gain or advantage, including benefit to any other person or entity in whose welfare he is interested, but not an advantage promised generally to a group or class of voters as a consequence of public measures which a candidate engages to support or oppose. [MPC § 240.0(1).]

According to the MPC commentary, the term "benefit" was defined "so broadly [ ] to reach every kind of offer to influence official * * * action by extraneous incentives." MPC commentary §§ 240.0 and 240.1 at 24.

It is clear that an offer of a non-pecuniary benefit in an attempt to influence official action may constitute "bribery" under the Code. *See* Cannel, *supra, Criminal Code Annotated* at 464; *cf. State v. Phelps*, 187 *N.J.Super.* 364, 375 (App. Div.1983) (in prosecution for official misconduct, "benefit" under *N.J.S.A.* 2C:27–1 "need not necessarily be pecuniary"), aff'd, 96 *N.J.* 500 (1984). *See generally State v. Begyn*, 34 *N.J.* 35, 47–48 (1961) (discussing the "broad offense" of common-law bribery in New Jersey); 1 Schlosser, *Criminal Laws of New Jersey*, § 25.1 (3d ed.1970), *quoted in* Cannel, *supra, Criminal Code Annotated* at 464 ("The common law offense of bribery is very broad. * * * Bribery is the receiving or offering any undue reward by or to any person whatsoever, in a public office, in order to influence his behavior in office and incline him to act contrary to the known rules of honesty and integrity.").

The State contends that defendant offered a "benefit" to Fluck and Mulhern that also inured to the benefit of the school district "as consideration for" a decision to grant him tenure. Under the State's theory, the benefit offered by defendant to Fluck, Mulhern, and the school district was that the information concerning misconduct by teachers at the school would not be

---

Further, under subsection d, "the giving of a benefit in exchange for even a lawful, required action becomes criminal." *Id.* at 465.

made public if defendant were given tenure.[6]  Significantly, the State also contended that defendant's intention to release this information about teacher misconduct was the basis for the "threats" count of the indictment.  The State apparently viewed the proofs necessary to sustain the "bribery" conviction and the "threats" conviction as interchangeable:

> Fluck basically tells me what you get, so I can do something about it.  I will tell you if you give me tenure.  A *quid pro quo*.  The *quid pro quo* is proper * * * and is an exercise of Mr. Fluck's function as a public officer.  *That is classical bribery.  It doesn't involve money.  It's a threat.*
>
> There is another benefit.  The other benefit, conversely, is if you hire me I will not make this public.  I won't blow it up behind your back and embarrass you and the school.
> *That's a threat and bribery at the same time.*
>
> As to the threat, clearly you say I am going to create a scandal and I am going to hide this information about what is going on in the school.  (Emphasis added.)

Defendant asserts that the State prosecuted the case by emphasizing the "threats" count of the indictment, (*N.J.S.A.* 2C:27–3a(2)), which prohibits threats of harm to a public official in order to influence a decision.  "Harm" is defined in *N.J.S.A.* 2C:27–1c as "loss, disadvantage or injury, or anything so regarded by the person affected, including loss, disadvantage or injury to any other person or entity in whose welfare he is interested."  The "harm" threatened need not be unlawful. *See* Cannel, *supra, Criminal Code Annotated* at 468.  Defendant contends that the proofs established at most a threat to disclose unfavorable information and not the offer of a benefit, and that "the exact same indirect or circumstantial evidence

---

[6]We note some variation in the State's theory concerning the intended recipient of the "benefit."  In response to defendant's motion for acquittal, the State contended that "the benefit offered is that the information * * * would be provided to Mr. Fluck, Mr. Mulhern, those concerned as to what was going on in the school."  Before the Appellate Division and before this Court the State contended that the "benefit" was offered to the school district rather than to Fluck or Mulhern.  The State argues that the "school district" includes all employees, students, parents, the School Board itself and its representatives, including Fluck and Mulhern.

cannot support * * * inferences that a statutorily proscribed 'harm' and 'benefit' co-exist."

■ In *State v. Begyn,* 34 *N.J.* 35 (1961), a case involving the common-law offense of misconduct in office, we acknowledged some difficulty in distinguishing among certain crimes constituting official misconduct:

> Consideration of the legal issues should be had in the light of a clear understanding of the elements of misconduct in office and related offenses as those crimes exist in New Jersey today. Some basic confusion is found because the term "misconduct in office" is sometimes used in a generic sense to refer broadly to all official wrongdoing, thus including in its sweep the more particularized crimes of extortion, bribery and the like, as well as in the special sense, as here, to designate an offense which bears no other name and is comprised of elements differing in some particulars from those of the related crimes. Distinctions have become shadowy and labels imprecise and somewhat non-exclusive. There are many situations, like that before us, where essentially the same factual situation could properly ground a prosecution for more than one of these offenses. [*Id.* at 45.]

Nevertheless, we are convinced that the Legislature did not contemplate that the same proofs could establish both the "benefit" element of bribery and the "harm" element of the "threats" offense. Our reading of the relevant provisions of chapter 27 of the Code persuades us that the Legislature intended to prohibit two generically-distinct categories of conduct, both of which seek to achieve the corruption of public officials. Three sections of chapter 27 are directed at conduct intended to corrupt public officials by bribery, 2C:27-2, compensation, 2C:27-4, or gifts, 2C:27-6. Two sections of chapter 27 prohibit conduct intended to corrupt public officials by threats of harm, 2C:27-3, or actual harm, 2C:27-5. The difference between the two broad categories of conduct prohibited by these sections is unmistakable. On the one hand, chapter 27 prohibits the offer or receipt of money or other benefits in return for official action. These provisions prohibit "payoffs" —in money or other benefits—to induce action by public officials. Alternatively, the threat or actual infliction of harm to

induce official action is also proscribed. The thrust of these provisions is to prevent public officials from being coerced or intimidated in the discharge of their duties.

There is no suggestion in this statutory scheme that a defendant who threatens a public official with harm to induce official action has simultaneously conferred a benefit on the official by agreeing to withhold the harm if the requested action is forthcoming. Nor is it reasonable to conclude that one offering an illegal benefit to a public official to induce official action has simultaneously threatened harm to that official consisting of the withdrawal of the benefit if the action sought does not occur. In our view, the statutory construction urged by the State, that the "bribery" and "harm" provisions of chapter 27 are virtually interchangeable, distorts the plain meaning of the statute.

In this case, the State proceeded primarily on the theory that defendant's behavior, in "threatening" to disclose information "worse than Yrigoyen" unless he received tenure, constituted a "threat of harm" contrary to *N.J.S.A.* 2C:27–3. Simultaneously, the State contended that defendant's "offer" *not* to disclose this information, or to disclose it privately to Mulhern or Fluck, in return for tenure constituted a "benefit" under the bribery statute. *N.J.S.A.* 2C:27–2. We reject the latter contention, and hold that the evidence presented by the State in this case cannot sustain defendant's conviction of bribery under the Code.

The judgment of the Appellate Division is affirmed.

*For affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.