**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5380-17T4

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

JOSEPH TOLOTTI, TOMASZ
KWINTIUK, and STEPHEN
HOUBARY,

    Defendants-Respondents.

_____

Argued November 13, 2018 – Decided February 20, 2019

Before Judges Sumners and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-10-0909.

Harold B. Shapiro, First Assistant Prosecutor, argued the cause for appellant (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Harold B. Shapiro and Andre R. Araujo, Assistant Prosecutor, of counsel and on the brief).

Robert M. Perry argued the cause for respondent Stephen Houbary (Daniel M. Rosenberg & Associates, LLC, attorneys; Robert M. Perry, on the brief).

Michael L. Testa argued the cause for respondent Tomasz Kwintiuk (Testa, Heck, Testa & White, PA, attorneys; Michael L. Testa, on the brief).

Vincent J. Pancari argued the cause for respondent Joseph Tolotti (Capizola, Pancari, Lapham & Fralinger, attorneys, join in the briefs of respondents Stephen Houbary and Tomasz Kwintiuk).

PER CURIAM

In this appeal, the State contends the Law Division misapplied the law in dismissing indictment counts charging second-degree conspiracy to commit official misconduct and second-degree official misconduct (collectively official misconduct charges) against defendants, Vineland Police Department (VPD) police officers, Tomasz Kwintiuk and Stephen Houbary, and New Jersey Department of Corrections (DOC) officer, Joseph Tolotti. The charges stem from allegations that defendants falsely reported a golf cart accident while they were all off-duty.

As to Kwintiuk and Houbary, we conclude that because regulations covering their employment required them to truthfully report the accident even though they were off-duty, their alleged conduct constitutes a prima facie case of the official misconduct charges. As to Tolotti, his alleged conduct would not

constitute a prima facie case of the official misconduct because guidelines covering his employment imposed no similar requirement while he was off-duty and his role as an accomplice in the conspiracy was not presented to the grand jury. We therefore affirm the dismissal of the official misconduct charges as to Tolotti, but reverse the dismissal of the official misconduct charges as to Kwintiuk and Houbary and remand them for trial.

I

The Accident

One afternoon in March 2016, while off-duty, Kwintiuk and fellow VPD Officer Jose Torres, met at Tolotti's Vineland home at 001 Trento Avenue, for an afternoon social get together. Riding on Tolotti's two-person golf cart, the three friends traveled approximately 1.7 miles on a paved public street and dirt road to the Double Eagle Bar. Houbary, another off-duty VPD officer, and Christian Kirschner, a retired VPD officer, later joined them at the bar. After a few hours of drinking, Kwintiuk, Tolotti and Torres got back on the golf cart to return to Tolotti's house.

Moments later, a motorist observed the golf cart entering the public highway at top speed from a dirt roadway when the cart driven by Tolotti suddenly "veered toward the center of the road so as to [jerk] left and . . . rip the

wheel right" with a "hard cut" onto the farmland at 002 Trento Avenue. As the cart rode over the dip between the paved highway road and the dirt driveway of 002 Trento Avenue, Torres, who was riding on the back of the golf cart in the storage space for golf bags, fell off onto the ground and hit his head. The motorist stopped his vehicle and yelled at the golf cart's two remaining occupants as it continued to drive away, seemingly unaware that Torres had fallen off the golf cart.

Within minutes, the golf cart drove back to where Torres was lying motionless on the ground. Tolotti and Kwintiuk, while laughing, told the motorist that Torres was okay and "faking it." The motorist did not think so, telling them that Torres was badly injured and insisting that they call for emergency medical services (EMS). However, Tolotti and Kwintiuk continued laughing and said, "[h]e's alright. He's okay."

At some point, Houbary and Kirchner arrived at the accident scene. The motorist subsequently left when they arrived and Houbary took charge. Torres, still unconscious, was placed onto the golf cart and transported to Tolotti's house, which was about 800 feet from the accident scene.

<u>The Reporting of the Accident</u>

At approximately 5:13 p.m., Houbary called VPD dispatch, stating, "[h]ey yo, it's Houbary. Do me a favor. Dispatch an ambulance to Trento in front of [002] for a possible concussion. Yeah, [002] Trento." Less than two minutes later, Houbary called back, stating, "[h]ey, do me a favor. Wrong address. [001] Trento. [001] for concussion." When the dispatcher called Houbary back asking how the accident occurred, he replied that the injured person "[f]ell off golf cart on the driveway . . . ."

When EMS arrived at Tolotti's house, Torres was sitting upright in the golf cart, unresponsive, lethargic and confused. They observed swelling and a hematoma on the back of his head. In response to an EMS responder's questions about the accident, one of the defendants replied that Torres "fell off a golf cart traveling at unknown speed, lost consciousness, and hit his head on blacktop[.]"[1] There was, however, no blacktop at the residence. Torres was transported to a helicopter landing zone, placed on life support and flown by MedEvac to the hospital.

---

[1] The record does not reflect which defendant made the statement.

A-5380-17T4

At the helicopter landing zone, VPD Officer Makos[2] interviewed defendants regarding the accident. They relayed the same story. Tolotti and Kwintiuk stated that Torres fell off the golf cart while they were driving around on the grass of Tolotti's private residence. While still at the Double Eagle a few minutes after Tolotti, Kwintiuk and Torres had left, Houbary stated he received a call from someone informing him that Torres was injured. He immediately left the bar and went straight to Tolotti's house.

VPD Sergeant Flores also interviewed Kwintiuk and Houbary at the helicopter landing zone. Kwintiuk professed that, "he did not know . . . how or why Torres fell off the golf cart[.]" Houbary reiterated what he told Makos earlier. Later, while on duty at the police station and being questioned by Sgt. Flores, Houbary reported that upon his arrival at Tolotti's house, he asked Kwintiuk and Tolotti if anyone called for medical assistance, and they said no. Neither defendant mentioned that the accident actually occurred at 002 Trento Avenue rather than Tolotti's house.

A few hours later, around 9:24 p.m., VPD Lieutenant Adam Austino contacted Kwintiuk to determine where Torres fell off the cart. After giving

---

[2]  The record does not disclose his first name nor that of the later mentioned Sergeant Flores.

A-5380-17T4

vague answers, Kwintiuk eventually said Torres had fallen at Tolotti's house near the patio and grill "onto gravel . . . and the golf cart immediately came to a stop near the patio[.]" Austino's investigation, however, revealed that there were no tire impressions on the grass between the patio and the driveway, and no other evidence (vomit or disturbances) indicating an accident at the location.

Torres was diagnosed at the hospital with intracranial bleeding, hemorrhaging and an eye fracture.

### The Indictment/Dismissal of Official Misconduct Charges

About three weeks later, an investigation by the Cumberland County Prosecutor's Office Professional Standards Unit concluded that evidence was tampered with and the accident location was falsely reported as occurring on Tolotti's property instead of a public roadway. Hence, defendants were later indicted for fourth-degree conspiracy, N.J.S.A. 2C:5-2(a)(1), (2) (count one); fourth-degree endangering another person, N.J.S.A. 2C:24-7.1(a)(2) (count two); fourth-degree false reports to law enforcement, N.J.S.A. 2C:28-4(b)(1) (count three); fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(1) (count four); fourth-degree obstructing administration of law or other governmental function, N.J.S.A. 2C:29-1(a) (count five); second-degree conspiracy to commit official misconduct, N.J.S.A. 2C:5-2(a)(1), (2) and

7

N.J.S.A. 2C:30-2(b) (count six); and second-degree official misconduct, N.J.S.A. 2C:30-2(b) (count seven).

Defendants subsequently filed a motion to dismiss the entire indictment. The motion judge entered an order dismissing the official misconduct charges, but he declined to dismiss the remaining less serious fourth-degree charges. In his written decision, the judge cited State v. Hinds, 143 N.J. 540, 549 (1996), for the proposition that defendants, as law enforcement officers, cannot be liable "for official misconduct whenever they violate the law . . . ." The judge recognized that the regulations provided to the grand jury governing Kwintiuk and Houbary's employment "establish that [they] were on notice regarding their behavior [off-duty]." The regulations mandated that they "were required to be truthful at all times, whether [they were] under oath or not[,]. . . not interfere with the proper administration of justice[, and] . . . not provide false communications in any investigation when it was reasonable to expect that it would be relied upon by the" investigators. As for Tolotti, the judge noted that the grand jury was provided a regulation stating that no corrections officer shall violate the laws, statutes or ordinances of the United States or any State.

The judge, however, granted the motion to dismiss the charge of official misconduct as to all defendants because even though the regulations "provide

direction . . . [and] behavior that would also be clearly inherent in the nature of their offices," they would also apply equally to all citizens and, therefore, were not enough to sustain the indictment. The judge pointed out that the questioning of defendants took place while they were off-duty "and, should the trier of fact believe the State's version of the events, they lied to the [VPD investigating] officers regarding where the accident happened."[3] The judge reasoned, "[t]he [private] behavior of the [defendants] did not touch nor involve their official positions . . . . To punish [them] for official misconduct with the facts as alleged leads the [c]ourt down the slippery slope of punishing off-duty officers for all criminal acts that might occur." In support, the judge referred to Justice Weintraub's concurrence in State v. Cohen, 32 N.J. 1, 13-15 (1960), in holding that finding defendants' allegedly private misconduct as sufficiently related to their public office so as to establish official misconduct would open a "pandora's box" of criminal claims for seemingly anything a police officer does off-duty.

With respect to the charge of conspiracy to commit official misconduct, the judge explained that since the allegations "do not support liability for

_____

[3] Houbary also made false statements when he was on-duty later that same day. Because we find that he and Kwintiuk had a duty to be truthful at all times, even while off-duty, we need not consider these later statements.

[official misconduct], . . . for the same reasons, [they] do not support" conspiracy to commit official misconduct.

The State's appeal followed.

II

We begin with the principles that guide our review of a motion judge's order to dismiss indictment charges. We then address how these principles apply to the dismissal of the official misconduct charges in this case.

An indictment is presumed valid and should only be dismissed if it is "manifestly deficient or palpably defective." State v. Hogan, 144 N.J. 216, 229 (1996). We review a judge's decision on a motion to dismiss an indictment for a clear abuse of discretion. State v. Zembreski, 445 N.J. Super. 412, 424 (App. Div. 2016). "However, if a trial court's discretionary decision is based upon a misconception of the law, a reviewing court owes that decision no particular deference." Ibid. (quoting State v. Lyons, 417 N.J. Super. 251, 258 (App. Div. 2010)).

In our review of the judge's decision, we recognize that granting a motion to dismiss an indictment should occur only in limited circumstances. As we have stated:

> One of the guiding principles to be followed by a court
> when considering a motion to dismiss an indictment is

10

that "a dismissal of an indictment is a draconian remedy and should not be exercised except on the clearest and plainest ground." State v. Williams, 441 N.J. Super. 266, 271 (App. Div. 2015) (alteration omitted) (quoting State v. Peterkin, 226 N.J. Super. 25, 38 (App. Div. 1988)). Therefore, once returned by a grand jury, an indictment should be disturbed "only when [it] is manifestly deficient or palpably defective." State v. Hogan, 144 N.J. 216, 228-29 (1996).

[Zembreski, 445 N.J. Super. at 424-25.]

A. Official Misconduct

The State contends that the judge misapplied the law in dismissing the charge of official misconduct. The State maintains that it established a prima facie claim of official misconduct because defendants are public officials[4] who breached an inherent duty and a duty under their respective employers' (VPD and DOC) work regulations, which were submitted to the grand jury, "to report their fellow participating law enforcement officers for crimes occurring in their presence and with their knowledge and participation." In particular, the State asserts defendants: endangered Torres; gave fictitious reports to law enforcement; tampered with physical evidence; and obstructed the administration of justice. By breaching their duties, the State argues despite the

---

[4] There is no doubt that defendants are public officials. "[C]ourts have consistently found that police officers are public officials . . . ." Costello v. Ocean Cty. Observer, 136 N.J. 594, 613 (1994).

11

fact that defendants did not ask the investigating law enforcement officers for special favors, they used their official status to convey a benefit on themselves and Tolotti to avoid criminal charges.

Defendants contend the court's dismissal of the official misconduct charges was consistent with the law. During the entire incident in question, they were acting as private citizens and, therefore, "subject to all of the same penalties, as any other private citizen" and not as public officials. Houbary individually argues that his additional statements made while on-duty, do not subject him to liability for official misconduct.

Defendants further argue that they did not commit official misconduct by failing to adhere to VPD and DOC regulations and, even if their conduct could be considered a breach of these regulations, the grand jury was not presented with sufficient documentation to establish a clearly inherent duty. They maintain that their employment regulations are not sufficient to establish legal duties because, based on State v. Thompson, 402 N.J. Super. 177, 201-202 (App. Div. 2008), generic rules and regulations, including employment rules, "do not necessarily impose a legal duty for the purposes of [o]fficial [m]isconduct" as they were not "acting under the color of their office." They also rely upon State v. Brady, 452 N.J. Super. 143, 150, 173 (App. Div. 2017), where this court

12

recently held that a Law Division judge, who was home on vacation, could not be liable for official misconduct by not enforcing an arrest warrant against her live-in boyfriend by contacting police to advise that he returned home because she did not have an inherent duty as a judge to do so.

Lastly, defendants contend they received no benefit from their actions. In particular, Houbary contends that since he did not witness the accident, he did not seek any special favors, and there was no evidence that his actions were done to benefit himself or others, he did not receive a benefit from his alleged actions.

Official misconduct is defined by N.J.S.A. 2C:30-2(b), which provides:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
>
> . . . .
>
> (b) He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.

An official misconduct conviction can be supported by establishing that the defendant's omission relates to expressed or inherent official duties and obligations. State v. Kueny, 411 N.J. Super. 392, 407 (App. Div. 2010); State v. DeCree, 343 N.J. Super. 410, 418 (App. Div. 2001); State v. Schenkolewski, 301 N.J. Super. 115, 144 (App. Div. 1997). Even if not imposed by law, the

13

duty may be "clearly inherent or implicit in the nature of the office[.]" State v. Maioranna, 225 N.J. Super. 365, 371 (Law Div. 1988); Schenkolewski, 301 N.J. Super. at 144; State v. Lore, 197 N.J. Super. 277, 282 (App. Div. 1984). A clearly inherent duty is "one that is unmistakably inherent in the nature of the public servant's office, i.e., the duty to act is so clear that the public servant is on notice as to the standards that he must meet." Kueny, 411 N.J. Super. at 406 (quoting II Final Report of the New Jersey Criminal Law Revision Commission, commentary to N.J.S.A. 2C:30-2, at 291 (1971)). Whether a duty is imposed upon a defendant is a legal question, it is up to the court to determine the question, not a grand jury. Brady, 452 N.J. Super. at 164-165.

In Kueny, this court overturned the defendant police officer's conviction of official misconduct because the record did not establish any specific statute, police department standard operating procedure, order, oath of office, rule or regulation that would require him to return money he obtained from an unauthorized automatic teller machine withdrawal from the victim's bank account. 411 N.J. Super. at 405-06. Previously, in Thompson, this court specified the types of regulations that establish a duty. 402 N.J. Super. at 201-202. The Conflicts of Interest Law and Code of Ethics were insufficient to impose a breach of duty for official misconduct purposes. Id. Specifically, the

14

two codes were generic in nature because they applied to everyone in the department and not specifically required in that particular office, and enforcement would result in strict criminal liability for mere ethical violations. Id. Moreover, the ethical and moral codes at issue in Thompson did not comply with procedural due process concerns since they did not "'set[] forth the principle that the law must give the person of ordinary intelligence a reasonable opportunity to know what is prohibited . . . .'" Id. at 203 (quoting State v. Lisa, 391 N.J. Super. 556, 578 (App. Div. 2007)).

More recently in Brady, this court recognized that the judge, who was home on vacation and not performing the duties of her office, did not have a non-discretionary duty, inherent in the office, to enforce an arrest warrant against her live-in boyfriend by alerting the police when he arrived home. 452 N.J. Super. at 149, 173. We further held that although ethical and moral obligations may indicate the judge should enforce a warrant, the Judicial Code of Conduct did not require enforcement of arrest warrants by the judge under the circumstances of the case. Id. at 173.

A-5380-17T4

<u>(1) Kwintiuk and Houbary</u>

The grand jury was presented with the following VPD regulations that the State claimed imposed an off-duty obligation upon Kwintiuk and Houbary, which they violated:

> 3:1.2 Action Off-Duty
> . . . while off-duty, police officers shall take any police-related action or any other action which may touch upon their position with the [VPD]; shall notify the highest ranking officer on-duty as soon as possible, and shall submit a written report . . .
>
> 3:1.4 Withholding Information
> Employees shall report any and all information concerning suspected criminal activity of others.
>
> 3:1.7 Providing False Information
> Employees shall not knowingly lie, give false or misleading information, or provide a false oral/written communication in any investigation when it is reasonable to expect that the information may be relied upon by the Department.
>
> 3:9.1 Compromising Criminal Cases/ Investigation
> Employees shall not interfere with the proper administration of criminal justice . . . .
>
> 3:13.5 Truthfulness
> Employees are required to be truthful at all times, whether under oath or not.

A-5380-17T4

These regulations are distinguishable from those relied upon by the State in Thompson and Brady to support charges of official misconduct, which were dismissed.

First, the VPD regulations were sufficient to give Kwintiuk and Houbary notice of what off-duty conduct is forbidden for Vineland police officers. Despite dismissing the official misconduct charge against them, the judge recognized that they had an obligation–even while off-duty–to be truthful in any police investigation. The judge determined:

> The [c]ourt agrees that the regulations do establish that the officers were on notice regarding their behavior [off-duty]. The officers were required to be truthful at all times, whether under oath or not[,] . . . to not interfere with the proper administration of justice[,] . . . to not provide false communications in any investigation when it [is] reasonable to expect that it would be relied upon by the Department. While [off-duty], [Kwintiuk and Houbary] were to take any police related action[,] which may touch upon their position with the [VPD].

Unlike in Thompson and Brady, the VPD regulations were not simply ethical or moral obligations imposed upon its police officers. Rather, they specifically delineate the appropriate action officers must take if something occurs while off-duty that touches on police-related matters. They prohibit police officers from withholding information, providing false information, being

dishonest at all times, and not compromising criminal investigations. They should not be reduced to mere suggestions simply because they outline conduct that, theoretically, every citizen should follow.

We continue to abide by Hinds, which, as noted, held that not all private conduct by a police officer rises to the level of official misconduct. 143 N.J. at 549. We are also mindful and appreciate the judge's citation of Justice Weintraub's concurrence in Cohen, regarding concerns that a police officer's private misconduct would expose the officer to criminal charges for seemingly anything done while off-duty. Neither, however, alters our thinking, given that the VPD regulations detailing the off-duty responsibility of Houbary and Kwintiuk are applicable to the alleged conduct. As the majority in Cohen, stated, "[a] police officer must not himself violate the laws he is sworn to enforce . . . ." 32 N.J. at 10.

A golf cart accident in which someone is seriously injured, and where the accident occurred, is undoubtedly a matter for police investigation. The VPD regulations clearly require Houbary and Kwintiuk to make truthful statements during a police investigation regardless of whether they were on- or off-duty as police officers. The regulations require off-duty officers to take any police action that "may touch upon their position" and they "shall notify the highest

ranking officer on-duty as soon as possible."  Doing so is consistent with the understanding that police officers are cloaked with a special responsibility in our society, unlike private citizens, to protect the public and enforce the law essentially at all times.  Either Houbary or Kwintiuk could have reported to their respective supervisors the alleged false reporting and cover-up that was being committed regarding the accident.  Thus, there was probable cause that Houbary and Kwintiuk chose to act in a way that completely disregarded their duty as police officers.

Furthermore, the grand jury could have found that Kwintiuk and Houbary derived a "benefit" from their actions as required by N.J.S.A. 2C:30-2(b) to constitute official misconduct.  A "benefit" in a chapter 30 offense "means gain or advantage, or anything regarded by the beneficiary as gain or advantage, including a pecuniary benefit or a benefit to any other person or entity in whose welfare he is interested."  N.J.S.A. 2C:27-1(a).

In our view, the State presented prima facie evidence to the grand jury that Kwintiuk sought a benefit to avoid possible discipline by not reporting the accident arrest when it occurred,[5] and not truthfully reporting where and how

---

[5]  Houbary reported the accident when he arrived at the accident scene after the accident.

the accident occurred. The State's grand jury prima facie evidence against Houbary established that his action of covering up the accident with defendants was beneficial to aid Kwintiuk from possible summons and internal discipline for numerous traffic offenses. See State v. Corso, 355 N.J. Super. 518, 526 (App. Div. 2002) (upholding a conviction where the jury could find the defendant, an off-duty police officer, who did not arrest individuals committing a crime in his presence, was a benefit to himself or to the individuals). In short, the "joint criminal activity" of Kwintiuk and Houbary suggests that they were protecting each other from possible criminal and employment responsibility. See Hinds, 143 N.J. 551.

(2) Tolotti

We reach a different conclusion as to the regulations that the State claimed govern Tolotti's employment as a corrections officer and his off-duty behavior. The responsibility of DOC corrections officers is to "ensure the custody, safety, and care of criminal offenders confined in [s]tate correctional facilities."[6] The State presented the grand jury with a DOC regulation providing: "Article [one], Section [one], [n]o officer shall violate the laws, statutes, or ordinances of the

---

[6] STATE OF NEW JERSEY, DEPARTMENT OF CORRECTIONS, CAREERS IN CORRECTIONS, https://www.state.nj.us/corrections/pages/careers2.shtml.

United States . . . or any State of the United States or of any political subdivision thereof" and "[s]ection [seven] . . . , [n]o officer shall make or cause to be made any false or misleading statements. No officer shall intentionally omit or misrepresent facts or information known to the officer."

A corrections officer's duties are confined to the supervision of inmates under the care and control of the DOC. As a corrections officer, Tolotti did not have the authority to enforce our criminal laws as Kwintiuk and Houbary did as police officers. There was no nexus between Tolotti's off-duty misconduct and his position as a corrections officer because the DOC regulations do not impose a responsibility on him to truthfully report the accident. He, therefore, cannot be charged with official misconduct as a public official, and can only be charged as a private citizen. Consequently, we agree with the judge's dismissal of the charge against Tolotti.

B. Conspiracy to Commit Official Misconduct

The grand jury indicted defendants with conspiracy under N.J.S.A. 2C:5-2(a)(1), which provides:

> a. Definition of conspiracy. A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he:

A-5380-17T4

(1) Agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime[.]

The State asserts that the judge erred in dismissing the charge of conspiracy to commit official misconduct because there was more than enough evidence presented to the grand jury to establish a prima facie offense of official misconduct. The State points to the cell phone calls defendants made to each other the night of the accident, in order, as co-conspirators, to maintain the false narrative that the accident occurred on Tolotti's property and not the public roadway.

On the other hand, defendants urge that there was insufficient evidence of a conspiratorial goal to sustain the charge. Specifically, they maintain there was no evidence of any agreement between the parties to further a criminal goal.

It is well settled that a conspiracy may be proven by circumstantial evidence. State v. Phelps, 96 N.J. 500, 509 (1984). Generally, circumstantial evidence is tested:

by the rules of ordinary reasoning such as govern mankind in the ordinary affairs of life. While certain actions of each of the defendants, when separated from the main circumstances and the rest of the case, may appear innocent, that is not significant and undoubtedly appears in every case of criminal conspiracy.

[State v. Samuels, 189 N.J. 236, 246 (2007) (quoting State v. Graziani, 60 N.J. Super. 1, 13-14 (App. Div. 1959)).]

Hence, "[a]n implicit or tacit agreement may be inferred from the facts and circumstances[,]" State v. Kamienski, 254 N.J. Super. 75, 94 (App. Div. 1992), because co-conspirators generally act in silence and secrecy, State v. Cagno, 211 N.J. 488, 512 (2013).

(1) Kwintiuk and Houbary

The grand jurors heard evidence that defendants falsely reported the accident location and created a false accident scene to mislead investigators to believe that the incident took place on private property, Tolotti's house, rather than the public road where it actually occurred. As mentioned, this allegation establishes a prima facie case of official misconduct against Kwintiuk and Houbary. The evidence of the phone calls between defendants the night of the accident was presented to the grand jury as evidence to support the charge of conspiracy to commit official misconduct–the cover-up of the accident location.

As the judge stated in his written decision, "a fair inference may be drawn that [defendants] discussed with each other the accident and their individual statements to the officers." Therefore, there was sufficient prima facie circumstantial evidence of a conspiracy by Kwintiuk and Houbary to agree to,

23

aid in the planning of, solicit, and commit the criminal charges outlined in counts one through five and seven of the indictment.

(2) Tolotti

The indictment charges Tolotti with violating N.J.S.A. 2C:5-2(a)(2), which defines conspiracy as promoting or facilitating the commission of a crime with another person or persons by "[a]gree[ing] to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime." The State argues that his purposeful actions as an accomplice constitute conspiracy to commit official misconduct to the same extent as Kwintiuk and Houbary. The State explains that even if Tolotti's misconduct does not fall under official misconduct because the DOC employs him, he may be a conspirator as a private person with his co-defendants in their acts of official misconduct.

In State v. Bryant, 257 N.J. Super. 63, 68 (App. Div. 1992), we recognized that "[m]isconduct by public officials frequently is encouraged, aided and facilitated by persons outside government and, therefore, accomplice liability is consistent with the statutory aims of deterrence and punishment implicit in N.J.S.A. 2C:30-2." Yet, in order for liability for conspiracy to commit official misconduct to attach to Tolotti, whose conduct did not constitute official

misconduct, the State must show that Tolotti "acted with the purpose of promoting or facilitating the substantive offense for which he is charged as an accomplice." Hinds, 143 N.J. at 551.

Again, we reach a different result concerning Tolotti. The inference that applied to Kwintiuk and Houbary from the telephone calls to establish a prima facie charge of conspiracy of official misconduct, did not apply to Tolotti even though he also participated in the calls. He is a corrections officer, not a VPD police officer, and the State presented no evidence to the grand jury that he was aware of the regulations governing Kwintiuk and Houbary's employment as police officers. Hence, there was no prima facie evidence that he "aided" in their plans to falsely report how and where the accident happened with the understanding that doing so violated their obligation as police officers, despite being off-duty, not to interfere with the proper administration of justice and make false reports in a police investigation. Therefore, the judge properly dismissed the conspiracy charge against Tolotti.

Affirmed as to the dismissal of indictment counts six and seven against Tolotti. Reversed as to the dismissal of indictment counts six and seven against Kwintiuk and Houbary.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5380-17T4